**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 27, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 27, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 100060-0 |
| Respondent, | EN BANC |
| v. | Filed: October 27, 2022 |
| SABELITA LAVAUGHN HAWKINS, | |
| Petitioner. | |

GORDON McCLOUD, J.—In 2012, Isabelita[1] Hawkins pleaded guilty to felony harassment and second degree malicious mischief. In 2019, she moved to vacate those convictions under RCW 9.94A.640. That statute grants trial courts discretion to vacate certain felony convictions if the movant satisfies specific mandatory statutory prerequisites.

In this case, the State—and the court—agreed that Hawkins met the mandatory statutory prerequisites. But the court denied the motion to vacate because of the severity of the crimes of conviction, despite undisputed evidence of Hawkins' substantial and consistent rehabilitative actions.

---

[1] The record reflects the use of both Isabelita and Sabelita as Hawkins' first name.

No. 100060-0

Hawkins asks this court to clarify the scope of the trial court's discretion under RCW 9.94A.640. We hold that that vacatur statute clearly confers discretion on the trial court. But that discretion is not unlimited. Instead, the language and the structure of the vacatur statute treat the commission of a serious crime as a *prerequisite* to vacatur, not a barrier to vacatur. Because committing a serious crime is a prerequisite to eligibility under the statute, the fact that the judge believed the crime was serious cannot justify denying relief. Instead, the court must meaningfully consider evidence of mitigation and rehabilitation since the time of the crime and exercise its discretion based on its assessment of the extent of rehabilitation.

We hold that the trial court abused its discretion in this case because it placed singular focus on negative historical facts about the crimes and disregarded Hawkins' uncontradicted evidence of rehabilitation and mitigation. Since the statute unambiguously places the discretion to assess the extent of rehabilitation in the hands of the trial court, we reverse and remand to that court to consider Hawkins' motion consistent with this opinion.

FACTS AND PROCEDURAL HISTORY

I.    Hawkins is charged with two crimes after having a mental health crisis

Hawkins is a Black Navy United States veteran and single mother. In 2011, she was 43 years old and had no criminal history. 2 Clerk's Papers (CP) at 82. In

2

No. 100060-0

October of that year, while at her job as a nurse with the United States Department of Veterans Affairs (VA), Hawkins experienced an episode of psychosis. *Id.* at 90. She threw a stapler at a coworker; it missed the coworker but hit and damaged a copy machine. 1 CP at 28; 2 CP at 90. Hawkins was charged with third degree assault for that incident. 1 CP at 9. Afterward, Hawkins was hospitalized, diagnosed with insomnia, depression, and anxiety. 2 CP at 90. Her doctor prescribed an antipsychotic medication and an antianxiety medication. *Id*. At a follow-up appointment, her psychiatrist prescribed the antidepressant sertraline; several weeks later, the psychiatrist increased the dosage of sertraline and scheduled another follow-up. *Id.*

In December 2011, before that next follow-up, Hawkins experienced another psychotic episode at her mother's house. *Id.* at 90-91. According to a certification for determination of probable cause, Hawkins was watching a TV program discussing Mayan predictions about the end of the world when she abruptly slammed the table and began yelling, "We are all going to die . . . Get me a gun . . . I'm ready to die . . . I'm gonna kill myself . . . We are all gonna die." 1 CP at 4. Hawkins' mother tried to calm her, and Hawkins and her mother "struggled" for a few moments before Hawkins "suddenly went limp and . . . appeared to be unconscious." *Id.* at 5. After a few minutes, Hawkins "regained consciousness" and attacked her mother with a kitchen knife, causing serious injuries. *Id.*; 2 CP at 90-

3

No. 100060-0

91. Once police arrived, Hawkins continued "screaming and yelling obscenities and talking to 'Michael Jackson' even though there was no one by the name of Michael Jackson at the scene." 1 CP at 4. Hawkins was arrested and charged with first degree assault (domestic violence). *Id.* at 1, 8. The arrest form attached to the statement of probable cause lists Hawkins' race as Black. *Id.* at 7.

Hawkins was detained in the King County jail for nearly a year. During that time, the State and Hawkins' defense team worked closely together to ensure that Hawkins received the mental health treatment she clearly needed. 1 Verbatim Report of Proceedings (VRP) at 23. The prosecutor recognized that while Hawkins' actions were "very serious," "there were significant mitigating circumstances and circumstances that . . . need treatment and need to be addressed." *Id*. Hawkins' attorney agreed that "it's clear to anybody looking at it . . . that clearly what happened is related to her mental health . . . there's really no other explanation." *Id.* at 38-39.

The parties initially worked to resolve the case through a plea of not guilty by reason of insanity, but they changed course when it became clear that "it would not be feasible" to have the VA provide treatment in the community following that plea. *Id.* at 23. Instead, the parties carefully crafted a different plan that would ensure Hawkins received stable housing, supervision, and treatment in the community. *Id.* at 23-24. The State amended the information, reducing the first

4

No. 100060-0

degree assault charge to felony harassment (domestic violence) and the third degree assault charge to second degree malicious mischief. *Id.* at 4-5; 1 CP at 15-16. Hawkins pleaded guilty to these reduced charges and to a related charge of fourth degree assault (domestic violence) in King County District Court Regional Veterans Court. 1 CP at 39; 1 VRP at 23-24. The parties also agreed to request a first-time offender waiver pursuant to RCW 9.94A.650. 1 CP at 43. As part of the waiver, the parties agreed to recommend 12 months of community custody with conditions, including mental health evaluation and treatment. *Id.*

In her "Statement of Defendant on Plea of Guilty," Hawkins admitted only to conduct supporting the reduced charges. *Id.* at 28. On her felony plea agreement form, however, Hawkins stipulated that the certifications for probable cause and the prosecutor's summary were real and material facts "for purposes of this sentencing." *Id.* at 39. *See* RCW 9.94A.535(2) (codification of real facts doctrine).

The trial court judge reviewed the plea agreement and accepted Hawkins' plea. 1 VRP at 21-22. At sentencing, the State filed a psychiatric evaluation from Western State Hospital, which the highly experienced trial court judge called "one of the most thorough Western State reports I've ever read." *Id.* at 22. The Regional Veterans Court monitor working with Hawkins stated that he was "almost speechless" at the "huge transformation" that he observed in Hawkins' mental health, well-being, and insight into her condition since she started treatment. *Id.* at

5

No. 100060-0

34. Hawkins' mother, Sandra Johnson—a victim of the crimes—asked the court to permit contact with Hawkins outside the home and expressed her support for Hawkins' recovery. *Id.* at 29. She described Hawkins as "a very honorable person, a very loving person, [who] has never yet one day, Your Honor, given me one ounce of problems . . . This disease has come into her heart, into her life, and now we have to fix it." *Id.* at 32. Hawkins expressed her love for her mother and her great remorse. *Id.* at 42. She explained that she was a "med-surg" nurse and had received some training in mental health disorders but was unable to see the signs that her own mental health was declining. *Id.* She committed to continue treatment to ensure nothing like this ever happened again. *Id.* at 43.

The court granted the parties' request for a first-time offender waiver. 1 CP at 47. Pursuant to that waiver, the court imposed a 90-day sentence on each count and 12 months of community custody. *Id*. The agreed community custody conditions included mental health and substance abuse evaluation and treatment, compliance with orders of the Regional Veterans Court, and living at VA housing for two years. *Id.* at 51. The sentencing court expressed its support for this resolution: "I think you can move on and move forward. You're obviously an extraordinarily intelligent person, and you have accomplished a lot in your life." 1 VRP at 45.

6

No. 100060-0

II.      After Hawkins completes her sentence and moves to vacate her convictions, a new judge denies her motion to vacate

Over the next few years, Hawkins continued with her mental health treatment and fully complied with her community custody conditions. 2 CP at 83. In January 2015, the court ordered a "Certificate and Order of Discharge" under RCW 9.94A.637, which certified that Hawkins had completed all the terms of her sentence. 1 CP at 52.

In 2019, Hawkins became eligible to apply to vacate her convictions under RCW 9.94A.640. She filed a motion to vacate. *Id.* at 54. The prosecutor signed off on Hawkins' proposed order to vacate and confirmed that Hawkins was statutorily eligible. 2 CP at 77.

The matter came before the original judge's newly appointed successor. He denied Hawkins' motion to vacate in a written order. 1 CP at 54. The order stated:

> The Court has carefully reviewed the record in this case, including Hawkins's Statement of Defendant on Plea of Guilty; the Certifications for Determination of Probable Cause ("Certifications"); and Hawkins's Felony Plea Agreement, in which she stipulated to the facts in the Certifications. These documents detail the underlying events during which Hawkins made death threats and chased and stabbed her mother with an eight-inch knife and, on another occasion, became hostile and caused damage at a healthcare facility. Exercising its discretion under RCW 9.94A.640(1), and based on the particular facts of this specific case, the Court finds that it is not reasonable or appropriate to allow Hawkins to withdraw her guilty plea or to vacate her conviction.

1 CP at 54-55 (citations omitted).

No. 100060-0

In January 2020, Hawkins filed a second motion to vacate. 2 CP at 71. In order to address "the concerns expressed by the Court" in its previous order, she attached a mitigation report and a medical report to provide more information about her mental health at the time of the offenses and her rehabilitation. *Id.*

The mitigation specialist noted that Hawkins is currently diagnosed with PTSD (posttraumatic stress disorder), depression, anxiety, and brief psychotic disorder. *Id.* at 83. She has "continually and consistently" participated in mental health treatment and services through the VA since her release from jail in 2012. *Id.* She has not been hospitalized since her release from jail and has retained full custody of her daughter. *Id.* Hawkins wants to go back to school to earn a master's degree in psychiatric nursing or psychology to become a "resource to veterans and veterans of color." *Id.* at 84. But she reported that her convictions have been a major barrier to securing employment and stable housing. *Id.* at 83. She lost her nursing license as a result of the convictions and has struggled to find even part-time employment. *Id.* at 82. As of the time of the report, Hawkins lived in temporary housing in Houston, Texas, where she relocated with her nine-year-old daughter to provide support for her aging father. *Id.*

The medical report, prepared by psychiatrist Dr. David Dunner, confirmed that Hawkins has continued mental health treatment and has not experienced a

No. 100060-0

psychotic episode or hospitalization since 2013.[2] *Id.* at 91. The report also provided more context for Hawkins' mental health at the time of the 2011 incidents and described Hawkins' lifelong struggles with depression. *Id.* at 90-93. Dr. Dunner opined that the treatment Hawkins received for the October 2011 psychotic episode fell below the standard of care and that "the episode related to Ms. Hawkins stabbing her mother might have been prevented had greater attention been paid to her diagnosis and follow-up." *Id.* at 94.[3]

---

[2] The medical report was prepared as a CR 35 psychiatric examination for a civil lawsuit that Hawkins filed against the VA, alleging malpractice in diagnosis and treatment following her October 2011 psychotic episode. 2 CP at 89. It appears that this federal suit is still ongoing. *See Hawkins v. United States*, 14 F.4th 1018, 1021 (9th Cir. 2021). We express no opinion on that case.

[3] Dr. Dunner's conclusion that Hawkins' treatment fell below the standard of care is consistent with a broader problem, that is, medical racism in the United States. *See generally* JOHN HOBERMAN, BLACK & BLUE: THE ORIGINS AND CONSEQUENCES OF MEDICAL RACISM (2012). Studies show that racial bias affects physicians' treatment of Black women's complaints of pain or mental health issues, often causing physicians to disregard or misdiagnose such complaints. *See id.*; CTR. FOR MENTAL HEALTH SERVS., U.S. DEP'T OF HEALTH & HUM. SERVS., MENTAL HEALTH: CULTURE, RACE, AND ETHNICITY – A SUPPLEMENT TO MENTAL HEALTH: A REPORT OF THE SURGEON GENERAL (2001), https://www.ncbi.nlm.nih.gov /books/NBK44243/pdf/Bookshelf_NBK44243.pdf [https://perma.cc/X43T-SD4G]; Kelly M. Hoffman et al., *Racial Bias in Pain Assessment and Treatment Recommendations, and False Beliefs About Biological Differences Between Blacks and Whites*, 113 PROC. NAT'L ACAD. OF SCI. 4296, 4300 (2016), https://www.pnas.org/content/pnas/113/16/4296.full.pdf; Dayna Bowen Matthew, *Toward a Structural Theory of Implicit Racial and Ethnic Bias in Health Care*, 25 HEALTH MATRIX 61, 66-73 (2015).

No. 100060-0

After reviewing these additional 75 pages of materials, the trial court denied

Hawkins' second motion. 1 CP at 56-57. Except for noting that he had also

reviewed the medical report and the mitigation report, the judge denied the motion

using language identical to the language from his September order. *Id.*

III.     Hawkins appeals and then seeks review in this court

Hawkins appealed. She argued that the trial court abused its discretion by

considering unproven allegations in the probable cause statements. Br. of

Appellant at 19 (Wash. Ct. App. No. 81259-9-I (Sept. 11, 2020)). She also argued

that the "statute's lack of criteria for when a court 'may' deny a person's motion to

vacate leaves this decision open to unconscious judicial bias." *Id.* at 26 (citing

RCW 9.94A.640). She urged the court to construe the statute to require the court to

vacate a qualifying applicant's criminal record. *Id.* at 26-27.

The Court of Appeals affirmed. *State v. Hawkins*, No. 81259-9 (Wash. Ct.

App. Jun. 7, 2021) (unpublished),

https://www.courts.wa.gov/opinions/pdf/812599.pdf. First, it applied *State v.*

*Kopp*, 15 Wn. App. 2d 281, 288, 475 P.3d 517 (2020), and ruled that the trial court

did not abuse its discretion by relying on statements in the probable cause

certifications when considering the motion to vacate. *Hawkins*, slip op. at 5. Next,

it noted that Hawkins raised the arguments about unconscious racial bias for the

first time on appeal "in contravention of RAP 2.5(a)." *Id.* at 6. But the appellate

10

No. 100060-0

court addressed the merits of that claim anyway and ruled that "without evidence" it could not say "that Hawkins's race played a role in her prosecution, sentence, or the denial of a motion to vacate her convictions." *Id.* Finally, the appellate court concluded that the trial court had not abused its discretion in denying her motion to vacate. *Id.* at 8.

Hawkins petitioned for review in this court, raising two issues. First, she argues that the trial court abused its discretion by relying on allegations contained in probable cause certifications. Pet. for Review at 13-14. She argues that crediting those allegations carries too high a risk that implicit racial bias will affect the decision, so we should construe the vacate statute to "limit judicial discretion" to deciding whether the applicant meets the statutory eligibility criteria. *Id.* at 20. Second, she argues that the Court of Appeals erred by "subject[ing] Ms. Hawkins's claim that unlimited judicial discretion risks perpetuating racist outcomes to RAP 2.5(a) review and [by] requir[ing] 'evidence' that 'Hawkins's race played a role in her prosecution, sentence, or the denial of a motion to vacate her convictions,' before considering the issue." *Id.* at 2-3. We granted review. Order, *State v. Hawkins*, No. 100060-0 (Wash. Jan. 5, 2022).[4]

---

[4] Two amici briefs were filed in support of the petition for review. *See* Amici Curiae Mem. of Wash. Def. Ass'n et al. in Supp. of Review; Mem. of Amici Curiae in Supp. of Review Nw. Just. Project et al. Two amici briefs were filed after we granted review. *See* Br. of Amici Curiae Nw. Just. Project et al.; Br. of Amici Curiae Pub. Def. Ass'n et al.

ANALYSIS

I.    RCW 9.94A.640 requires the trial court to treat the qualifying conviction as a *prerequisite* to vacatur, not as a bar to vacatur; the trial court commits an abuse of discretion by treating that prerequisite as a bar to vacatur instead

Long after serving their sentences, people with criminal histories face severe collateral consequences that can include "barriers to voting, serving on a jury, holding public office, securing employment, obtaining housing, receiving public assistance, owning a firearm, getting a driver's license, qualifying for financial aid and college admission, qualifying for military service, and deportation (for noncitizens)."[5] Since Black, Indigenous, and other people of color remain overrepresented in the criminal justice system,[6] these adverse consequences have a racially disproportionate impact.  People with mental illness are also disproportionately represented among criminal defendants;[7] hence, these adverse consequences also have a disproportionate impact on this group.

---

[5] U.S. COMM'N ON CIV. RTS., COLLATERAL CONSEQUENCES: THE CROSSROADS OF PUNISHMENT, REDEMPTION, AND THE EFFECTS ON COMMUNITIES 1-2, 15 (2019) (footnotes omitted), https://www.usccr.gov/files/pubs/2019/06-13-Collateral-Consequences.pdf [https://perma.cc/K55V-KYWR].

[6] Colleen Chien et al., *The Washington State Second Chance Expungement Gap* (2020), https://digitalcommons.law.scu.edu/facpubs/971 (although only 4.2 percent of Washington's population is Black, Black individuals represent 11 percent of Washingtonians with a criminal record and 15 percent of Washingtonians with a felony record); WASH. STATE SUP. CT. GENDER & JUST. COMM'N, 2021 GENDER JUSTICE STUDY:  EXECUTIVE SUMMARY AND RECOMMENDATIONS 51 (2021), https://www.courts.wa.gov/subsite/gjc/documents/2021_Gender_Justice_Study_Executive_Summary_and_Recommendations.pdf.

[7] *See* Br. of Amici Curiae Nw. Just. Project et al. at 7-9 (citing numerous studies).

12

RCW 9.94A.640 takes a step to address that problem. The statute authorizes individuals with certain criminal convictions to "apply to the sentencing court for a vacation of the . . . record of conviction." Vacatur entitles an individual to rejoin society free of "all penalties and disabilities resulting from the offense." RCW 9.94A.640(4)(a). In fact, the statute provides that "an offender whose conviction has been vacated may state that the offender has never been convicted of that crime" for all purposes, "including responding to questions on employment applications." *Id.*; *see generally* RCW 9.94A.640 (listing consequences and limitations of vacatur).

Because Hawkins argues that the trial court erred in its application of RCW 9.94A.640, we begin by examining this statute de novo to determine the legislature's intent. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015). As always, we discern legislative intent "from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Id.* (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

RCW 9.94A.640's plain language shows that the legislature was mainly concerned with rehabilitation and mitigation—not with the severity of the

13

underlying crime. The statute provides that to establish eligibility, the applicant

must first receive a certificate of discharge under RCW 9.94A.637; this certifies

that the applicant has completed all requirements of the sentence, including

payment of all legal financial obligations. RCW 9.94A.640(1). The statute then

states, "If the court finds the offender meets the tests prescribed in subsection (2)

of this section, the court may clear the record of conviction." *Id.*

Subsection (2) lists disqualifying conditions that exclude would-be

applicants who have not rehabilitated. For example, the court cannot vacate a

conviction if the applicant has currently pending criminal charges in any state or

federal court, RCW 9.94A.640(2)(a), and depending on the class of the felony of

conviction, the statute imposes a waiting period during which the applicant must

remain free of new convictions. RCW 9.94A.640(2)(c), (d).

The statute also disqualifies people with certain types of convictions from

eligibility completely. These disqualified classes of convictions include "violent

offense[s] as defined in RCW 9.94A.030" and "crime[s] against persons as defined

in RCW 43.43.830," with the exception of certain robbery and assault charges

where the conviction did not include a firearm, deadly weapon, or sexual

motivation sentence enhancement. RCW 9.94A.640(2)(b). The specificity of these

exclusions indicates that the legislature has carefully considered which crimes

involving violence are so serious that they bar vacatur.

14

No. 100060-0

Then, if the applicant meets these stringent mandatory eligibility criteria, the statute states that "the court *may* clear the record of conviction." RCW 9.94A.640(1) (emphasis added). The legislature's use of the word "may" constitutes a clear grant of discretion to the trial court; this is especially true when contrasted with the statute's later use of the mandatory verb "shall." *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435, 656 P.2d 1083 (1982) (citing *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 633-34, 555 P.2d 1368 (1976)).

But the statute does not provide further guidance on how the trial court should exercise that discretion. This case requires us to address that now.

*A. The plain language of the statute confers discretion on the trial court*

Hawkins argues that RCW 9.94A.640's grant of discretion applies only to the trial court's assessment of the statutory criteria for eligibility. Suppl. Br. of Pet'r at 31. She continues that once the trial court finds those eligibility criteria met, the trial court must grant the motion. *Id.* Hawkins' conclusion on this point, however, is not based on the statutory language; it is based on her argument that permitting trial courts to exercise discretion by considering other information, particularly information gleaned from probable cause certifications, poses too high a risk that bias will infect the court's decision. *Id.*

15

No. 100060-0

We disagree with this interpretation of the statute. We certainly agree that racial bias affects judicial decision-making. This court has taken judicial notice of this fact and has acknowledged our duty to eliminate this effect. *State v. Gregory*, 192 Wn.2d 1, 22, 427 P.3d 621 (2018) (plurality opinion); Letter from Wash. Sup. Ct. to Members of Judiciary & Legal Cmty. (Wash. June 4, 2020) https://www.courts.wa.gov/content/publicUpload/Supreme%20Courts%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7].

But Hawkins' proposed interpretation reads the legislature's unambiguous grant of discretion, represented by its use of the word "may," out of the statute entirely. Separation of powers principles bar us from second-guessing the legislature's policy decision to grant discretion to the trial court in this context. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 506, 198 P.3d 1021 (2009). The reason is that it is "[t]he legislature's role . . . to set policy and to draft and enact laws." *Id.* Courts may not "rewrite unambiguous statutory language under the guise of interpretation." *Jespersen v. Clark County*, 199 Wn. App. 568, 578, 399 P.3d 1209 (2017) (citing *Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155 (2006)). And courts cannot "remove words from statutes or . . . create judicial

16

No. 100060-0

fixes, even if we think the legislature would approve." *State v. Reis*, 183 Wn.2d 197, 215, 351 P.3d 127 (2015).[8]

Hawkins also argues that the trial court erred as a matter of law in considering the information contained in the probable cause certifications as a basis for denying her motion. Hawkins explains that she stipulated to the facts alleged in those certifications for sentencing purposes only, not for any other purpose. She urges us to construe the statute to prohibit the court from considering probable cause certifications when deciding a vacatur motion.

Again, we disagree. The plain language of the statute does not bar the court from considering a probable cause certification, whether or not the defendant stipulated to its consideration for sentencing purposes.[9] Indeed, the statute does not

---

[8] Further, there are legitimate, rehabilitation-related reasons not to read the statute to limit the court's consideration to the criteria explicitly listed in RCW 9.94A.640(2). Although the disqualifying criteria are detailed and thorough, they do not cover every possible reason that a court might reasonably find an applicant ineligible. For example, RCW 9.94A.640(2)(a) makes an applicant ineligible if they have currently pending criminal charges "in any court of this state or another state, or in any federal court." That leaves out other jurisdictions in which the applicant might have pending charges, such as tribal court. It would be reasonable for a court to deny a motion to vacate where an applicant had a currently pending charge in an unlisted jurisdiction.

[9] As discussed below, though, the fact that Hawkins stipulated to facts for the purposes of sentencing *does* matter in determining whether the amount of weight the court placed on those facts was reasonable.

17

No. 100060-0

bar the court from considering *any* specific source of information.[10] The legislature knows how to limit the information a court can consider in making a discretionary sentencing decision under the SRA.[11] *E.g.*, RCW 9.94A.530(2) (sentencing court "may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing"). And the legislature did not place such a limitation in the vacatur statute. Hawkins' stipulation to the facts in the probable cause statements for purposes of sentencing is therefore irrelevant to whether the trial court can consider those facts at the motion to vacate hearing.

To be sure, Hawkins and amici raise important points. Probable cause certifications are prepared "for purposes wholly unrelated to vacatur," and hence they do not address the vacate statute's main concern: whether the applicant has rehabilitated since the time of the crime. Amici Curiae Mem. of Wash. Def. Ass'n et al. at 13. And probable cause certifications can undoubtedly be affected by the author's implicit or explicit biases. Br. of Amici Curiae Pub. Def. Ass'n et al. at 14-18. But we can't address those issues by misreading the plain language of the statute.

---

[10] Neither the parties nor amici make any argument regarding the admissibility or inadmissibility of probable cause certifications (or any other information) under the Rules of Evidence.

[11] Sentencing Reform Act of 1981, ch. 9.94A RCW.

18

No. 100060-0

*B. Consistent with the purpose of RCW 9.94A.640, the court must treat the underlying conviction as a prerequisite to vacatur, not a bar; and it must exercise its discretion by focusing on the applicant's current state of rehabilitation*

Instead, our role is to provide guidance to courts in exercising their discretion under the statute as written. Read as a whole, RCW 9.94A.640 focuses on whether the applicant currently demonstrates rehabilitation. Thus, in deciding a motion to vacate, the court may not rely solely or even primarily on facts about the underlying crime and it may not treat the qualifying conviction as a bar to vacatur. We hold that in exercising its discretion under the statute, the court must consider the four factors listed below.

i.      Make sure there is a qualifying conviction

When considering a motion to vacate under RCW 9.94A.640, the trial court must start by confirming that the movant has committed a qualifying felony. That means that the trial court must treat the qualifying felony as a prerequisite to vacatur, not as a bar to vacatur.  The legislature chose to include all sorts of crimes on its list of qualifying felonies, including felonies that involve violence; trial courts cannot second guess that legislative choice.

ii.      Make sure the applicant has a certificate of discharge

After the trial court has established that the applicant has a qualifying felony, it must confirm that the applicant has a certificate of discharge under RCW

19

No. 100060-0

9.94A.637. This certificate shows that they have completed all requirements of the sentence, including payment of all legal financial obligations. RCW 9.94A.640(1).

   iii. Make sure the applicant is not disqualified for any of the reasons in subsection (2)(a)

The statute then lists disqualifying conditions that exclude would-be applicants who have not rehabilitated. For example, the statute bars the court from vacating a movant's conviction if the movant has a pending criminal charge. RCW 9.94A.640(2)(a). And the court cannot vacate a conviction until the conviction-free waiting periods prescribed by RCW 9.94A.640(2)(c) and (d) have elapsed.

   iv. Decide whether to clear the record of conviction based on the level of rehabilitation

If the applicant meets these stringent statutory criteria, including a conviction of a qualifying felony, "the court *may* clear the record of conviction." RCW 9.94A.640(1) (emphasis added). The purpose of the statute must guide the trial court's exercise of this clearly granted discretion.

What is the purpose of the statute? We have previously explained that the vacatur statute is "'a legislative expression of public policy'" that a "'deserving offender'" should be restored to her "'preconviction status as a full-fledged citizen.'"[12] That legislative intent aligns with the overall purposes of the SRA,

---

[12] *State v. Breazeale,* 144 Wn.2d 829, 837, 31 P.3d 1155 (2001) (explaining that legislative intent behind the pre-SRA dismissal statute and the SRA vacatur statute is the same (quoting *Matsen v. Kaiser*, 74 Wn.2d 231, 237, 443 P.2d 843 (1968) (Hamilton, J.,

20

No. 100060-0

which include "protect[ing] the public" and "[offering] the offender an opportunity to improve himself or herself." RCW 9.94A.010(4), (5). In line with this statutory purpose, the trial court must focus on whether the applicant has demonstrated sufficient postconviction change to show rehabilitation.

If the court chooses to consider probable cause certifications, it must properly assess the relevance and weight of the information those certifications contain. A probable cause certification might not be relevant at all, for example, if the defendant was tried on the charged crime, but the jury rejected those allegations and instead convicted of only a lesser crime. A probable cause certification might have some relevance, for example, if it describes a crime to which a defendant pleaded guilty as charged and stipulated to the existence of the facts described in that statement. And a probable cause certification might have limited relevance, as in this case, if it was drafted to support a different crime, of which the defendant was not convicted, yet that certification contains mitigating mental health information.

We therefore must address *Kopp*, which the Court of Appeals deemed controlling and which the State urges us to follow here. 15 Wn. App. 2d 281. Like Hawkins, Kopp stipulated to facts in the probable cause certification for sentencing

---

concurring))), *abrogated on other grounds by State v. Barber*, 170 Wn.2d 854, 872 n.4, 248 P.3d 494 (2011).

purposes. *Id.* at 287. The trial court in that case stated that it "reviewed the records in the case, Kopp's plea statement and plea agreement, and the certification for determination of probable cause." *Id.* at 283. And that trial court denied the motion to vacate in an order that focused solely on the "'underlying criminal acts'" alleged in the probable cause certification. *Id.* at 284 (quoting the record).

Kopp argued that the trial court abused its discretion in "relying on the facts of the crime in deciding to deny his motion to vacate." *Id.* at 287. The Court of Appeals rejected this argument. It reasoned that the statute requires the applicant to submit a motion to vacate to the sentencing court—which is the same court that previously considered stipulated facts from a probable cause statement or prosecutor's summary for the purpose of sentencing—so the sentencing court committed "no abuse of discretion in relying on those same facts when deciding whether to vacate that conviction." *Id.* at 288. It was clear from Kopp's motion "that Kopp pleaded guilty to a reduced charge, and that Kopp completed the terms of his community custody." *Id.* at 289. But the Court of Appeals held that the trial court did not abuse its discretion by simply deciding "that the aggravating facts of the crime outweighed these mitigating facts." *Id.*

We overrule *Kopp* to the extent that it holds that the trial court has the discretion to deny a motion to vacate because the underlying crime was

No. 100060-0

particularly serious. *Id.* at 289.[13] As discussed above, RCW 9.94A.640's plain language says that the qualifying crime constitutes a *prerequisite* to relief.

Instead, the court must treat the underlying conviction as one of the prerequisites. It must then exercise its discretion by considering information about whether the defendant has shown sufficient rehabilitation since the time of the crime.

Information relevant to rehabilitation will be specific to each individual and each crime. For example, if the individual has a substance use problem that contributed to the crime, information that they have taken steps to address that problem will be relevant to rehabilitation. Likewise, if the individual has mental health issues or an anger management problem, evidence that they have addressed those issues will be relevant. With these considerations in mind, we turn to whether the court abused its discretion in this particular case.

---

[13] *Kopp* properly held that RCW 9.94A.640 confers discretion on the trial court and that it does not bar the court from considering probable cause certifications. We do not disturb that portion of *Kopp*.

II.     The trial court abused its discretion in denying Hawkins' motion because it treated the qualifying conviction as a bar to eligibility and because it failed to meaningfully consider extensive uncontradicted evidence of rehabilitation and mitigation

A decision-maker abuses its discretion if it applies the wrong legal standard, bases its ruling on an erroneous view of the law, or acts without consideration of and in disregard of the facts.[14] Under these standards, Hawkins' trial court abused its discretion in three ways.

First, the trial court abused its discretion by applying the wrong legal standard. It treated the crime of conviction as so serious, according to the certification for determination of probable cause, that it barred relief.  But the nature of the crime of conviction—even a serious or violent crime of conviction— is a *prerequisite* to eligibility for relief under the statute. It is not a bar to relief.

Second, the trial court committed an error of law by denying Hawkins' motion due to the unchangeable facts of her crimes. The court's order denying Hawkins' first motion to vacate shows that it relied solely on the facts of Hawkins' crimes (as described in the probable cause certifications). The trial court's second order denying Hawkins' motion to vacate (the order we are now reviewing) states that it also considered the recent mitigation and medical reports. But it still relied

---

[14] *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007) (citing *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006)); *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006) (citing *In re Pers. Restraint of Addleman*, 151 Wn.2d 769, 776-77, 92 P.3d 221 (2004)).

solely on the material in the probable cause certifications to deny relief. The probable cause certifications, however, contain exactly the same facts that the court had before it at the time of Hawkins' original sentencing hearing. Once again, RCW 9.94A.640 says that the conviction and sentence for the original crime is a prerequisite to relief, not a bar to relief. The trial court should have focused, instead, on the nature and extent of any evidence of postcrime rehabilitation, change, or remorse. *See In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 365, 139 P.3d 320 (2006) (Indeterminate Sentence Review Board (ISRB) abused discretion in relying on "the unchangeable circumstances" of parole applicant's crimes).

Third, the trial court abused its discretion by failing to meaningfully consider the extensive, uncontradicted evidence of rehabilitation and mitigation that Hawkins presented. Despite receiving 75 pages of additional information regarding Hawkins' rehabilitation and mitigation, the court issued an identical order denying the second motion.[15] The identical language of both orders provides a strong indication that the court disregarded the extensive uncontradicted evidence

---

[15] The State correctly notes that the trial court did not have the sentencing transcript in front of it when deciding the vacatur motions. Suppl. Br. of Resp't at 10. Although the sentencing transcript provides additional information about the State's commitment to working toward the best outcome for Hawkins given the mitigating circumstances of her case, the fact that the court did not have the transcript when deciding the instant motion does not change the abuse of discretion analysis. The trial court erred in disregarding the extensive rehabilitation and mitigation evidence presented to it in favor of a singular focus on allegations about the crimes themselves.

25

No. 100060-0

of rehabilitation submitted with the second motion. *Cf. Dyer*, 157 Wn.2d at 365 (though ISRB stated it considered psychological report, its decision gave "no indication that the evidence in the file supported its decision or that the evidence was used to refute any new evidence presented at the hearing"); *see also State v. Delbosque*, 195 Wn.2d 106, 118-19, 456 P.3d 806 (2020) (*Miller*[16]-fix resentencing court abused its discretion when it "disregarded . . . mitigation evidence").

The trial court also erroneously disregarded the extensive mitigating evidence that was developed earlier, prior to sentencing, some of which was summarized in the certification for determination of probable cause. For example, the certification relating to the incident where Hawkins attacked her mother strongly suggests that Hawkins was experiencing a mental health crisis. Combined with the information provided in Hawkins' mitigation and medical reports, it is clear that Hawkins was not in her right mind at the time of the crimes. Yet the court's order fails to mention Hawkins' documented, diagnosed mental health issues. Further, the court disregarded the evidence when it chose to describe Hawkins as "hostile," despite that word appearing nowhere in the record.[17]

---

[16] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[17] The court's repeated choice to use this word to describe a Black woman—instead of neutrally recounting the facts as alleged in the probable cause statement—is concerning and harmful. *See* Fanta Freeman, *Do I Look Like I Have an Attitude? How*

26

No. 100060-0

As discussed above, evidence of rehabilitation and mitigation will differ from case to case. Here, since the crimes involved mental health issues, the court should have considered Hawkins' uncontradicted evidence that she has continued treatment, has retained custody of her daughter, has not experienced another mental health crisis, and has no new convictions when deciding whether Hawkins has taken the "opportunity to improve . . . herself." RCW 9.94A.010(5).

We therefore reverse the trial court's decision to deny the motion to vacate and remand to that court to properly exercise discretion consistent with this opinion. *State v. Lamb*, 175 Wn.2d 121, 133, 285 P.3d 27 (2012).

III. We do not read the Court of Appeals' opinion as suggesting that individualized evidence of racial bias is necessary in any case where racial bias is an issue

Hawkins separately argues that the Court of Appeals improperly "subjected [her] claim that unlimited judicial discretion risks perpetuating racist outcomes to RAP 2.5(a) review and required 'evidence' that 'Hawkins's race played a role in her prosecution, sentence, or the denial of a motion to vacate her convictions,'

---

*Stereotypes of Black Women on Television Adversely Impact Black Female Defendants Through the Implicit Bias of Jurors*, 11 DREXEL L. REV. 651, 657 (2019) (discussing ways in which white culture has stereotyped Black women as "violent, hostile and aggressive"); J. Celeste Walley-Jean, *Debunking the Myth of the "Angry Black Woman": An Exploration of Anger in Young African American Women*, 3 BLACK WOMEN, GENDER & FAMS. 68 (2009), https://www.jstor.org/stable/10.5406/blacwomegendfami.3.2.0068.

No. 100060-0

before considering the issue." Pet. for Review at 2-3 (quoting *Hawkins*, slip op. at 6).

RAP 2.5(a) provides in part, "The appellate court may refuse to review any claim of error which was not raised in the trial court," with exceptions not relevant here. And the Court of Appeals did state that Hawkins raised the arguments about unconscious racial bias for the first time on appeal, "in contravention of RAP 2.5(a)." *Hawkins*, slip op. at 6. But that court went on to address the merits of that claim anyway. *Id.* It is certainly true that in addressing the merits of this claim the appellate court stated that "without evidence" it could not say "that Hawkins's race played a role in her prosecution, sentence, or the denial of a motion to vacate her convictions." *Id*. And Hawkins reads this as holding that a party must provide individualized evidence of racial bias in any case before the court can consider arguments on that subject. Pet. for Review at 19-20.

We don't read the Court of Appeals' decision that way. Such a holding would be contrary to controlling precedent of this court. We have made clear that we take "judicial notice of implicit and overt racial bias against [B]lack defendants in this state" and that we will consider such historical and contextual facts when deciding cases. *E.g.*, *Gregory*, 192 Wn.2d at 22. We have also recognized the judiciary's role in perpetuating racism within the justice system and have committed to changing that. Letter to Members of Judiciary & Legal Cmty., *supra*.

28

No. 100060-0

In line with that appreciation of historical and contextual accuracy, we have considered a wide variety of data when making our decisions. In some cases involving racially disproportionate outcomes, we have considered statistical evidence that was developed as part of the record. *E.g.*, *Gregory*, 192 Wn.2d at 12. In other cases, we have considered available data, history, and context, even if it was not developed as part of the record. *E.g.*, *State v. Sum*, 199 Wn.2d 627, 511 P.3d 92 (2022); *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022); *State v. Blake*, 197 Wn.2d 170, 192, 481 P.3d 521 (2021). In other words, the judicial branch can rely on history and context on issues of race to the same extent that courts have always relied on history and context to analyze all other issues. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 313 L. Ed. 2d 387 (2022) (considering history and context of right to bear arms); *id.* at 2163 (Breyer, J., dissenting) (same); *Obergefell v. Hodges*, 576 U.S. 644, 659-60, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015) (discussing history and context of right to marriage); *id.* at 713 (Scalia, J., dissenting) (same); *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 353-62, 496 P.3d 289 (2021) (considering history and context of state constitution's cruel punishment clause); *Wash. State Legislature v. Inslee*, 198 Wn.2d 561, 570-74, 498 P.3d 496 (2021) (considering history and context of state constitution's gubernatorial veto power); *id.* at 596 (Yu, J., dissenting) (same); *Wyman v. Wallace*, 94 Wn.2d 99, 102, 615 P.2d 452

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100060-0

(1980) (courts may take judicial notice of "social, economic, and scientific facts" when formulating legal rules).

CONCLUSION

We hold that the trial court abused its discretion in denying Hawkins' motion to vacate and that the Court of Appeals erred in affirming the trial court's ruling. We therefore vacate the order denying Hawkins' motion, reverse the decision of the Court of Appeals, and remand to the trial court to exercise its discretion consistent with this opinion.

_____
Gordon McCloud, J.

WE CONCUR:

_____          _____
                                                  Stephens, J.

_____          _____
        Johnson, J.                                    Yu, J.

_____          _____
        Madsen, J.                                  Whitener, J.

_____          _____
         Owens, J.                                  Toynbee, J.P.T.

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

No. 100060-0

GONZÁLEZ, C.J. (concurring in part, dissenting in part) — I agree with the reasoning of the majority opinion, but not with its result. The majority outlines a four factor test for judges to use in exercising their discretion under RCW 9.94A.640. It then details how the trial court abused its discretion in this case and strongly hints at how the facts should properly be considered. But the majority stops short of prescribing the proper outcome; instead, it remands the case to the trial court to exercise its discretion consistent with its opinion. But given the facts of this case, properly exercised discretion leads to only one outcome – Hawkins' motion to vacate should be granted. In the interest of judicial economy, I would grant the motion to vacate and direct the trial court to take the other actions necessary under RCW 9.94A.640 to implement relief.

Remand for further exercises of judicial discretion is both unnecessary and harmful. I recognize that when this court finds that a trial court has abused its discretion in some way, the normal course is to explain how the discretion was abused and remand to the trial court to reevaluate their decision based on our

1

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

guidance. *See, e.g.*, *State v. Lamb*, 175 Wn.2d 121, 133, 285 P.3d 27 (2012). That is because there are often other issues at play and the trial court has more knowledge of the case than a cold record would supply. But those considerations are not at issue here, and we have the power to take "action as the merits of the case and the interest of justice may require." RAP 12.2. The single issue is whether Hawkins' motion to vacate her convictions should be granted. The judge who denied the motion to vacate was not the judge who sentenced Hawkins. He relied on the same paper record that is before us. That record is clear and uncontroverted. I would therefore exercise this court's authority under RAP 12.2 and grant the motion to vacate.

The court today clarifies the proper application of RCW 9.94A.640 by announcing four factors that trial courts must consider when ruling on a motion to vacate. Only the fourth factor is at issue here.[1] That factor requires the trial court to "[d]ecide whether to clear the record of conviction based on the level of rehabilitation." Majority at 20. In doing so, the trial court "must focus on whether the applicant has demonstrated sufficient postconviction change to show rehabilitation. *Id.* at 21.

---

[1] There is no disagreement that the first three factors are satisfied. There was a qualifying conviction, the applicant has a certificate of discharge, and the applicant is not disqualified for any of the reasons listed in RCW 9.94A.640(2)(a). *See* majority at 19-20.

2

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

I agree with the majority that the trial court abused its discretion by (a) treating the crime of conviction as so serious that it barred relief, (b) relying on the unchangeable facts of the crime, and (c) failing to meaningfully consider extensive, uncontradicted evidence of rehabilitation and mitigation presented both at sentencing and as part of the second motion to vacate. *Id.* at 24-26.

The trial court based its denial on a review of the "record in this case," including the "Statement of Defendant on Plea of Guilty" (Statement), the "Certifications for Determination of Probable Cause" (Certifications), and the "Felony Plea Agreement" (Agreement). Clerk's Papers (CP) at 56. The court focused on specific facts in the Certifications and its conclusion from those facts that Hawkins had become "hostile" at one point. *Id.* at 57. A review of the record requires more than cherry picking facts and characterizing events. So, I discuss each of these documents in turn.

The Statement is a 13-page, mostly boilerplate form used to ensure a defendant understands their rights and those they are giving up by pleading guilty. CP at 17-29. Relevant here, Hawkins admits to domestic violence felony harassment because she made comments threatening to kill her mother in the December 15, 2011 incident. CP at 17, 28. Hawkins also admits to second degree malicious mischief because she caused damage to a copy machine at the United States Department of Veterans Affairs (VA). *Id.* The statement also indicates that

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

mental health issues are central to the case. CP at 21 (requiring mental health evaluation, no contact with mother except public places including treatment meetings, no contact with VA except for medical, psychiatric, and substance abuse purposes, references to King County District Court Regional Veterans Court). In short, the Statement establishes that Hawkins committed the crimes that are a prerequisite to vacatur and that mental health issues were likely a contributing factor.

The Agreement is a one-page boilerplate form. In it, Hawkins stipulates that there is a factual basis for mental health and substance abuse evaluations and treatment. CP at 39. And by checking a box, Hawkins stipulated that the facts set forth in the Certifications are real and material for purposes of sentencing. *Id.*

It is the facts in the Certifications that the trial court focused on when denying the motion to vacate. CP at 56-57. But the Certifications have "limited relevance" in this case because they were drafted to support a different crime. Majority at 21.

While not called out by the trial court, the "Judgment and Sentence" would also have been part of the record it reviewed. It clearly indicates that the sentencing court's finding that chemical dependency contributed to the offence and that it ordered Hawkins to obtain mental health and substance abuse evaluations and follow all recommended treatment. CP at 51. It further ordered that she live at

4

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

housing approved by the Regional Veterans Court as a term of her community custody. *Id.*

We do not know what other documents were initially reviewed by the trial court as part of the "record." We know from transcripts of the sentencing hearing, however, that the State filed a psychiatric evaluation from Western State Hospital. The sentencing judge called the evaluation "one of the most thorough Western State reports I've ever read." 1 Verbatim Report of Proceedings at 22. Whatever the contents of this report, it led the sentencing judge to agree to the parties' request for a first-time offender waiver and community custody conditions focused on mental health treatment and supportive housing through the Regional Veterans Court.

A full review of the record makes it clear that mental health issues were central to the crimes Hawkins pleaded guilty to and that mental health treatment was a key part of the sentence for those crimes. It is with that background that the trial court must "focus on whether the applicant has demonstrated sufficient postconviction change to show rehabilitation." Majority at 21.

It is hard to imagine what more evidence of rehabilitation a court could require than the uncontradicted reports submitted by Hawkins with her second motion to vacate. The reports indicate that Hawkins had "a history of multiple psychiatric encounters," some resulting in hospitalization, over the two-and-a-half

5

*State v. Hawkins*, No. 100060-0 (González, C.J., concurring in part, dissenting in part)

decades prior to the offenses at issue here. CP at 90. But she has not had any hospitalizations or mental health related incidents since she started treatment in 2012. CP at 84. We must consider the "evidence that she has continued treatment, has retained custody of her daughter, has not experienced another mental health crisis, and has no new convictions, when deciding whether Hawkins has taken the 'opportunity to improve . . . herself.'" Majority at 27 (alteration in original) (quoting RCW 9.94A.010(5)). Clearly, she has.

The majority directs the trial court on remand to "exercise its discretion consistent with this opinion." *Id.* at 30. Given the unique facts of this case, that exercise of discretion will necessarily result in the trial court granting the motion to vacate. Since there can be only one result, I would grant the motion to vacate and remand only for the nondiscretionary actions necessary to implement relief.

I respectfully dissent on relief.

_____
González, C.J.

6